IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHELLE ANN KOLLAR, | ) | CASE NO. 4:13CV2779 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Michelle Ann Kollar ("Kollar") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 12.

For the reasons stated below, the Commissioner's decision is **AFFIRMED**.

### I. Procedural History

Kollar protectively filed an application for DIB on December 29, 2010, alleging a disability onset date of March 8, 2008. Tr. 11, 114-115. She alleged disability based on the following: depression, anxiety, pituitary tumor, chronic pain, dysthymia, pinched nerve in neck and shoulder, scoliosis, bowel obstruction, "TMJ," and psoriasis. Tr. 157. After denials by the state agency initially (Tr. 80) and on reconsideration (Tr. 85), Kollar requested an administrative hearing. Tr. 25. A hearing was held before Administrative Law Judge ("ALJ") Thomas A. Ciccolini on September, 13, 2012. Tr. 26-46. In his September 26, 2012, decision (Tr. 11-20),

1

the ALJ determined that there were jobs that existed in significant numbers in the national economy that Kollar could perform, i.e., she was not disabled.  Tr. 19.  Kollar requested review of the ALJ's decision by the Appeals Council (Tr. 5) and, on November 1, 2012, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Kollar was born in 1971 and was 39 years old on the date her application was filed.  Tr. 18, 154.  She completed four years of college.  Tr. 158.  She previously worked as an administrative assistant for a trucking company and as a dietary aide.  Tr. 158.  Also, since 2010, she has been working part time as an assistant for a veterinarian.  Tr. 158.

### B. Relevant Medical Evidence[1]

#### 1. Mental

Beginning in April 2010, Kollar visited Turning Point Counselling Services for counselling for her depression.  Tr. 187, 519, 561.  On April 20, 2010, she reported depression, having few supports, being underemployed, and being a single mother.  Tr. 557.  She complained that she was forgetful, had difficulty concentrating, and suffered from sleep problems.  Tr. 557.

---

[1] Kollar, in her brief on the merits, relies on four pieces of evidence in support of her argument: two medical records from physicians, who she characterizes as "consultants"; a consultative examiner's opinion; and the transcript of her hearing.  Doc. 13, pp. 2-6.  The Court's recitation of the relevant medical records is, accordingly, brief.  *See* Magistrate Judge's Initial Order:

> The parties are expected to fully and fairly present to the Court all relevant evidence in the record, both favorable and unfavorable….A full recitation of all relevant evidence should be presented. Briefs shall cite concisely the relevant statutory and case law supportive of the party's position. Any facts recited in support of the "Argument" or "Analysis" section of the brief must also be set forth in the "Facts" section of the brief.

Doc. 5, p. 2.  Additionally, the Court notes that Kollar only challenges the ALJ's findings with respect to her mental disorders and gastrointestinal problems.  *See* Doc. 13.  The Court, therefore, does not consider items in the record concerning Kollar's other alleged disabilities.

The record shows that she was prescribed medications for her depression. *See, e.g*., Tr. 520-525, 460.

In early 2011, Kollar saw Chander M. Kohli, M.D., a neurosurgeon, complaining of neck pain, right shoulder pain, and headaches.[2]  Tr. 441-442.  Upon examination, Kollar was alert and oriented with fluid speech.  Tr. 442.  Her recent and remote memory, attention span, concentration, language and fund of knowledge were all described as normal.  Tr. 442. Additionally, Kollar had 5/5 motor strength in her extremities, except for her right triceps and biceps, which Dr. Kohli rated 4/5.  Tr. 442.

### 2. Physical

On June 16, 2010, Kollar saw Richard J. Marina, M.D., a physician specializing in gastroenterology.  Tr. 351-352.  Kollar explained to him that she was in a car accident in 1993 that caused her to injure her spleen and resulted in a laparotomy.[3] Tr. 351.  She reported that she has been hospitalized three times for self-limited bowel obstructions, in 1994, 2005 and 2010.  Tr. 351.   Dr. Marina noted that the obstructions were treated conservatively and did not require surgery.  Tr. 351.

Kollar complained of both diarrhea and constipation.  Tr. 351.  She stated that she has up to six bowel movements a day, usually in the morning, and that the bowel movements are preceded by cramping.  Tr. 351.  Dr. Marina noted that Kollar's self-reported history was not inconsistent with irritable bowel syndrome ("IBS").  Tr. 352.  He ordered a series of tests on her upper gastrointestinal ("GI") bowel tract and a small bowel follow through.  Tr. 352.  The subsequent GI series was unremarkable and showed mild gastro-esophageal reflux disease

---

[2]  The medical record of this visit erroneously lists the date of the visit as Kollar's birthday, February 23, 1971.  Tr. 441-442.  Other portions of the record indicate that Kollar visited Dr. Kohli in February and/or March, 2011.  *See* Tr. 188, 428.

[3]  A laparotomy is a surgical incision into the abdominal cavity.  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1005.

("GERD"). Tr. 348. The small bowel follow through series was normal. Tr. 349. On August 11, 2010, Dr. Marina assessed Kollar with IBS and gave her a trial of probiotic supplements for her symptoms. Tr. 347. He noted that her weight was unchanged and that her vital signs were normal. Tr. 347.

On April 25, 2012, Kollar saw Robert Marx, D.O. Tr. 593. Kollar complained of abdominal pain, bloating, constipation and diarrhea. Tr. 593. She reported that she went to the emergency room on March 25, 2012, and had a CAT scan. Tr. 593. Dr. Marx noted that her CAT scan was found to be normal at that time and that, after reviewing her CAT scan himself, he found no major abnormalities. Tr. 593. He found no evidence of bloating, fecal retention, or intestinal distension. Tr. 593. Upon physical examination, Dr. Marx commented that Kollar's weight remained the same as it was in December 2011. Tr. 593. He observed that Kollar's abdomen was "somewhat distended," although not tympanic, and that her bowel sounds were normal. Tr. 593. He started Kollar on Bentyl for "probable" IBS.[4] Tr. 593.

C. Medical Opinion Evidence

1. Consultative Examiner

On August 31, 2011, Dr. Kenneth Gruenfeld, a psychologist, conducted a consultative examination. Tr. 458-463. Kollar reported that she suffered from depression for over twenty years. Tr. 459. She complained of sadness, low self-esteem, frustration, irritability, racing thoughts, feelings of helplessness, social isolation, and problems with attention, focus, concentration, eating, and sleeping. Tr. 460. She stated that her depressive episodes last for weeks at a time. Tr. 460. She reported that she started suffering from panic attacks five years ago, that she has them daily, and that they last twenty to thirty minutes. Tr. 460. Dr. Gruenfeld

---

[4] Bentyl is an anti-spasmodic used to treat gastrointestinal disorders. *See* Dorland's at 208, 514.

noted that, according to Turning Point Counseling records, Kollar had been diagnosed with depressive disorder.  Tr. 460.

Kollar stated that the past year she has been working at a veterinarian's office for fifteen hours a week.  Tr. 459.  She previously worked as a dietary aide for one year, at Falcon Transportation for three years, and Footlocker for one year.  Tr. 459.  She reported that she always understood job tasks and never had a conflict with management, although she used to leave work due to problems with depression.  Tr. 459.

Kollar reported daily activities of bathing, working, resting and watching television.  Tr. 460.  She goes grocery shopping, manages her money and her medication, completes chores in the house, and is able to bathe and dress herself on a daily basis.  Tr. 460.  Kollar indicated that she skips many of these activities when she is depressed.  Tr. 460.

Dr. Gruenfeld observed that Kollar was polite and cooperative during the interview and that her task motivation was good.  Tr. 460.  Task persistence, attention, concentration, and response to direction and redirection were good.  Tr. 460.  Her speech was normal, conversation was logical and Dr. Gruenfeld observed no difficulties with expressive or receptive language skills.  Tr. 460.  Kollar's affect was appropriate.  Tr. 460.  She appeared sad during some of the evaluation when discussing her medical condition and the effect it had on her life.  Tr. 460.  She showed no signs of anger or irritability.  Tr. 460.  She denied having anxiety.  Tr. 461.

Dr. Gruenfeld commented that Kollar's mental content was normal.  Tr. 461.  She was oriented to person, place and time and was able to recall past historical events with an average amount of detail.  Tr. 461.  Her concentration and attention were adequate.  Tr. 461.  She could recall 3 of 3 simple objects after fifteen minutes, complete a serial 7 subtraction, and could recall five digits forward and four digits backward.  Tr. 461.

Dr. Gruenfeld opined that Kollar was unlikely to have problems in her ability to understand, remember, and carry out instructions.  Tr. 462.  He noted that Kollar reported no problems that would indicate a limitation in her ability to respond appropriately to supervisors and coworkers.  Tr. 462-463.  Dr. Gruenfeld stated that Kollar may have some problems in her ability to maintain attention, concentration, persistence and pace, and to perform simple and multi-step tasks.  Tr. 462.  With respect to Kollar's ability to handle pressures in the workplace, Dr. Gruenfeld observed that Kollar will isolate at work if she is feeling stressed and will leave work early or call in sick if she is having problems coping with her mental health issues.  Tr. 463.  Dr. Gruenfeld noted that there is no reported history of mental or emotional deterioration in response to work exposure. Tr. 463.  He diagnosed Kollar with major depressive disorder, mild, recurrent, and panic disorder, without agoraphobia.  Tr. 463.  He assessed a Global Assessment of Functioning ("GAF") score of 60.[5]  Tr. 463.

### 2. State Agency Reviewers

On March 14, 2011, Todd Finnerty, Ph.D., a state agency psychologist, reviewed Kollar's medical record.  Tr. 51-53.  Regarding Kollar's mental residual functional capacity ("RFC"), Dr. Finnerty opined that Kollar had moderate limitations in her ability to carry out detailed instructions and to maintain attention and concentration for extended periods.  Tr. 57.  He went on to explain that Kollar maintains the ability to perform simple and complex tasks that are repetitive.  Tr. 57.  He also opined that Kollar is capable of slow-paced tasks that are not quick changing in their duties. Tr. 58.

---

[5]  GAF (Global Assessment of Functioning ) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: Diagnostic & Statistical Manual of Mental Health Disorders, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id*.

On September 12, 2011, John Waddell, Ph.D., a state agency psychologist, reviewed Kollar's medical record. Tr. 69-70. Regarding Kollar's mental RFC, Dr. Waddell opined that Kollar is moderately limited in her ability to maintain attention and concentration for extended periods and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 74. He opined that Kollar maintains the ability to perform simple and complex tasks that do not require a rapid or consistent pace. Tr. 74.

On April 6, 2011, Dimitri Teague, M.D., a state agency physician, reviewed Kollar's medical record and completed a physical RFC assessment. Tr. 54-56. On August 25, 2011, Walter Holbrook, M.D., a state agency physician, also reviewed Kollar's record and completed physical RFC assessment. Tr. 71-73. Both doctors concluded that Kollar could perform light work on a full-time basis and found no limitations with respect to Kollar's gastrointestinal problems.[6] Tr. 18, 54-56, 71-73.

### D. Testimonial Evidence

#### 1. Kollar's Testimony

Kollar was represented by counsel and testified at the administrative hearing. Tr. 28-41. She testified that she lives with her mother and that she has a fifteen-year-old daughter. Tr. 30. She has a bachelor's degree in hospitality management. Tr. 29. She works three hours a day for a veterinarian answering phones and making appointments. Tr. 30. She has worked there almost two years. Tr. 31. She stated that the veterinarian is ninety-one years old and that he is very accommodating, making it easy for her to work there. Tr. 30.

Kollar previously worked part-time as a dietary aide in a nursing home for about a year. Tr. 31. The last time she worked full-time was in 2008 as a dispatcher for a trucking company. Tr. 31.

---

[6] The physicians found some limitations based on Kollar's history of a pituitary tumor. Tr. 55-56, 72-73.

Kollar testified that she was prevented from working on a full-time basis due to her mental problems, including depression, bi-polar, panic attacks, and sleeplessness. Tr. 30-31. She has IBS, and has to use the restroom seven times in the morning or all day long. Tr. 31. She stated that her most severe problem is her anxiety and depression. Tr. 34. At times she does not bathe daily because she has no energy or motivation. Tr. 34. She cries weekly for a half an hour, mostly at night, when she thinks about being a nuisance to her mother and her daughter. Tr. 37-38.

Kollar stated that she has problems with concentration. Tr. 37. She described how she once left the car running and how she once put both contacts in the same eye. Tr. 37. She also has problems with memory, such as keeping all her medications straight. Tr. 38. She used to file paperwork at the veterinarian's office and distribute petty cash, but she no longer performs those tasks because she was making mistakes. Tr. 39.

**2. Vocational Expert's Testimony**

Vocational Expert Barbara Burke ("VE") testified at the hearing. Tr. 40-46. The ALJ discussed with the VE Kollar's past relevant work as an administrative clerk. Tr. 40. The ALJ asked the VE to determine whether a hypothetical individual of Kollar's age and education could perform the job she performed in the past if that person had the following characteristics: can perform a full range of sedentary work that would be fairly repetitive and not involving a high production pace. Tr. 41. The VE testified that the person could perform Kollar's past relevant work. Tr. 41. The ALJ asked the VE if the additional limitation of having to occasionally stand up for a brief period of time and shift positions but not wander away from the work station would change the VE's testimony.[7] Tr. 45. The VE answered that it would not.

---

[7] The ALJ noted that he had watched Kollar for almost forty minutes and that he observed that she showed no discomfort, distress, or shifting. Tr. 45.

Kollar's attorney asked the VE to consider a hypothetical individual with the characteristics previously described by the ALJ in the first hypothetical but who would be forced to leave the work station to go to the bathroom seven or eight times a day, not every day, but frequently. Tr. 59-60. The VE answered that such an individual would be in an office setting and could, therefore, leave and go to the restroom as needed. Tr. 42. The operative question, the VE explained, was how long the individual would be off task. Tr. 42. Kollar's attorney asked the VE to consider an individual that was visiting the restroom for over fifteen percent of the workday. Tr. 42. The VE answered that it would be "questionable" if such an individual could perform the work if she was off task fifteen percent of the time and that if she was off task for twenty percent of the time she could not perform the work. Tr. 42.

Next, Kollar's attorney asked the VE to consider an additional limitation that the hypothetical individual would only be able to interact with coworkers in a "totally non-stressful environment" that would accommodate "for her ups and down, bipolar nature" that would result in her being off task twenty percent of the time.[8] Tr. 43. The VE answered that there would be no jobs for such an individual. Tr. 43-44.

Finally, Kollar's attorney asked the VE what significance a GAF score of less than 50 would have on a hypothetical individual's impairments.[9] The VE stated that a GAF of less than 50 is not "competitive employment." Tr. 44. Kollar's attorney asked the VE about the

---

[8] For this second hypothetical presented to the VE, Kollar's attorney stated that the hypothetical individual would not have the restroom restrictions he previously described, but then then proceeded to describe an individual who would need accommodations based on her bi-polar issues as well as her restroom demands. Tr. 43. Thus, both hypotheticals to the VE presented by Kollar's attorney contained a restriction that the individual would be off task up to twenty percent of the time due to restroom demands. The VE stated that it did not matter whether the individual would be off task because of mental or physical limitations—the important thing to consider was how much time the individual would be off task. Tr. 44.

[9] A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." DSM-IV-TR at 34.

9

significance of a GAF of 50. Tr. 44. The VE responded, "very routine, repetitive, very marginal .... assuming that GAF is over a prolonged period of time, and not just [once]." Tr. 44-45.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

    5.       If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[10] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his September 26, 2012, decision, the ALJ made the following findings:

1.       The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.  Tr. 13.

2.       The claimant has not engaged in substantial gainful activity since March 8, 2008, the alleged onset date.  Tr. 13.

3.       The claimant has the following severe impairments: migraine headaches, gastroesophageal reflux disease [GERD], anxiety disorder, and depressive disorder.  Tr. 13.

4.       The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 14.

5.       The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she is limited to the performance of simple, routine, and repetitive tasks with no high production standards or high rate pace.  Tr.16.

6.       The claimant is unable to perform any past relevant work.  Tr. 18.

---

[10] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

7.         The claimant was born on February 23, 1971 and was 37 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 18.

8.         The claimant has at least a high school education and is able to communicate in English.  Tr. 19.

9.         Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Tr. 19.

10.        Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 19.

11.        The claimant has not been under a disability, as defined in the Social Security Act, from March 8, 2008, through the date of this decision.  Tr. 19.

## V. Parties' Arguments

Kollar contends that she sustained her burden of showing that, due to a combination of exertional and non-exertional impairments, she could not do even sedentary work and that the Commissioner erred in determining that she had the RFC to perform jobs that exist in the national and regional economies.  Doc. 13, p. 1.  Kollar's apparent basis for these conclusions is her contention that she would be off task 20% of the time combined with the VE's finding that if an individual is off task 20% of the time, the individual would not be employable.  In response, the Commissioner submits that substantial evidence supports the ALJ's RFC assessment.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir.1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

Kollar argues that there is evidence to support her assertion that she has an impairment that rises to the level described by her attorney at the hearing—that she would be off task at work 20% of the time. Doc. 13, pp. 2-5. The Court notes that the standard is not whether evidence in the record can support an RFC assessment posited by a claimant, but whether there is substantial evidence in the record to support the ALJ's RFC assessment of the claimant. *See Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion.). Because substantial evidence supports the ALJ's RFC assessment, his decision must be affirmed. *See id*.

The ALJ discussed that, with respect to concentration, persistence and pace, Kollar had moderate difficulties. Tr. 15. He explained, however, that Kollar did not appear nervous during her consultative exam with Dr. Gruenfeld and that she performed well on tasks relating to memory and serial 7's. Tr. 15. "[W]eighing these signs of little to no compromise in concentration and task persistence against the reports of depression and crying spells," the ALJ found that the evidence supported no more than moderate limitations. Tr. 15. The ALJ also commented that Kollar admitted that she experienced depression for twenty years and that, during those twenty years, Kollar sustained periods of substantial gainful activity. Tr. 17. He observed that it was unclear how Kollar's symptoms have "worsened over the last twenty years

to support her now alleged mental disability." Tr. 17.  He stated, "the record does not establish any event to explain what changed concerning her depression and anxiety to reasonably suggest that [Kollar] can no longer perform any work due to mental disability."  Tr. 17.  The ALJ also considered Kollar's daily activities, including cleaning and shopping, and observed that they show that she retained the cognitive ability to focus on and persist at necessary tasks.  Tr. 17.  In sum, the ALJ found that Kollar retained the ability to perform simple, routine tasks in an environment free of high production quotas or high rate pace work.  Tr. 17.  The ALJ remarked, "the medical evidence of record does not reasonably support any greater mental limitations."  Tr. 17.

      The ALJ gave "significant" weight to Dr. Gruenfeld's opinion that Kollar had no limitation in her ability to understand, remember and follow instructions and some limitation in concentration and attention span for simple routine tasks and in tolerating stress.  Tr. 17.  The ALJ explained that Dr. Gruenfeld's opinion is consistent with the doctor's observations of Kollar and with the medical evidence elsewhere in the record.  Tr. 17-18.  The ALJ observed that there were no medical source statements in the record contradicting Dr. Gruenfeld's assessment.  Tr. 18.  The ALJ also gave considerable weight to the opinions of state agency reviewing physicians Drs. Waddell and Finnerty because they were supported by objective medical evidence and were consistent with Dr. Gruenfeld's opinion.  Tr. 18.  The ALJ adequately provided for Kollar's moderate limitation in concentration, persistence and pace by assessing an RFC that limited her to simple, routine and repetitive tasks with no high production standards or high rate pace.  Tr. 16.  See *Smith v. Comm'r of Soc. Sec.*, 2014 WL 1761596, at *13 (N.D. Ohio May 1, 2014) (concentration, persistence and pace adequately addressed in an RFC assessment limiting

14

claimant to simple, routine and repetitive tasks with no fast-paced production requirements or quotas).

With respect to Kollar's physical impairments, the ALJ thoroughly discussed Kollar's gastrointestinal problems. Tr. 16. He noted that "the record does not reflect sufficient episodes of [abdominal pain symptoms] to support the specifics of [Kollar's] allegations." Tr. 16. The ALJ observed that the record showed that Kollar experienced only three small bowel obstructions in the last twenty years, which does not suggest a frequency of pain necessitating significant work limitations. Tr. 16. The ALJ also pointed out that Kollar's tests were mostly normal, her GERD was mild, and she repeatedly presented with full muscle strength. Tr. 16. The ALJ remarked that he gave Kollar the benefit of the doubt and limited her to sedentary work, stating, "the record simply does not reflect a frequency of related episodes to warrant greater restrictions." Tr. 16. Finally, the ALJ remarked that Kollar's statements concerning the limiting effects of her symptoms are not credible to the extent that they are greater than and inconsistent with the ALJ's RFC assessment limiting her to sedentary work. Tr. 16.

Notably, Kollar does not assert that the ALJ's findings are not supported by substantial evidence or that the ALJ erred in some way. Instead, she argues that her testimony at the hearing and two treatment notes indicate that she has to use the restroom often. Doc. 13, pp. 2-4. Kollar then makes the leap to a hypothetical question her attorney asked the VE to consider—that, because of repeated restroom breaks, Kollar would be off task 20% of the time. Doc. 13, p. 4-5. However, Kollar does not cite evidence to support her purported assertion that her repeated restroom breaks would equate to being off task 20% of the time.

Kollar also appears to argue that the VE's testimony—that an individual with a GAF score of less than 50 would not be competitive and a GAF score of 50 would mean "[v]ery

15

routine, repetitive, very marginal"—should be taken to mean that Kollar is unable to perform work. *See* Doc. 13, p. 6. Kollar does not develop such an argument or identify evidence in the record indicating that she was assessed a GAF score of less than 50. The Court notes that Kollar was assessed a GAF score of 60 by Dr. Gruenfeld. Tr. 463. Any question posited to the VE regarding a GAF score of 50 or less, therefore, is not supported by evidence and thus is not relevant to this case.

## VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated: December 18, 2014

Kathleen B. Burke
United States Magistrate Judge